LittletoN, Judge,
delivered the opinion of the court.
The claim involved in this case for $58,552.43, plus 10% for profit, for alleged breach by defendant of the terms of a construction contract of April 8,1942, between plaintiffs and defendant, is made by plaintiffs for and on behalf of their subcontractor, known as William E. Orr, Contractors, a partnership. Findings 6,7 and 8. Under the unit price contract between plaintiffs and defendant the plaintiffs agreed to furnish the materials and perform the work for the construction of a railroad at the Navajo Ordnance Depot in strict accordance with the specifications, plans, and drawings, in consideration of the payment to them by defendant of the estimated sum of $1,462,272.
The Navajo Ordnance Depot project consisted of the construction of a depot for the storage of ammunition, covering an area of approximately forty-eight square miles about 11 miles west of Flagstaff, Arizona. It had a frontage on the main line of the Santa Fe Railroad of eight miles, and was approximately six miles deep. The project embraced the erection of between 700 and 800 buildings, of which 600 were magazines for the storage of ammunition, the construction of the railroad, and the building of approximately 175 miles of roads to serve the various buildings. There was also a combat equipment area.
There were approximately 30 prime contracts made in connection with the construction of the Navajo Ordnance Depot. The contract in suit was for the construction by plaintiffs of approximately 17 miles of main line track and about 1034 miles side track, including the necessary excavation, culverts, turnouts (switches), highway crossings, whistle posts and other items, at unit prices estimated to cost *259 $1,462,272. The total length of the railroad, including main and side track, turnouts and bridges, was to be about 31 miles.
It was necessary to have the railroad completed at the earliest possible moment, since the construction of the entire project was dependent to a large extent on having the railroad in operation so that other contractors would have a means of receiving their material, and thus facilitate work on the balance of the project.
Article 1 of the contract provided that the work should be commenced on or before April 8, 1942, and completed on or before June 21, 1942. On December 15, 1942, the work was accepted as having been substantially completed on December 1, 1942. Only minor deficiencies in the work remained to be completed after that date. The final estimate and voucher for $93,509.81 were made and executed March 10, 1943, and plaintiffs received payment April 5, 1943. On December 1, 1942, plaintiffs, by their general manager, signed an unqualified release of all claims against the Government under the contract.
Plaintiffs base their right to recover upon the contentions that the contract, which required them to procure materials only from sources designated by the Government, expressly represented that the allocation of such materials had been made by the Government, when in fact no such allocation had been made at that time; that by reason of the failure of defendant to make allocations in sufficient time to enable plaintiffs to receive the materials as needed for the orderly and efficient progress of the work, the completion of the contract was delayed and increased costs were incurred, and that such delay on the part of the Government was imreasonable and constituted a breach of the contract.
This was a war contract and plaintiffs knew that the materials to be used in the performance thereof were under strict controls by the War Department and they must have known that such materials were being or would be allocated for use on various defense projects on the basis of the greatest need. The contract contemplated that delay by reason of such controls, priorities and allocations would probably occur. Plaintiffs say that they interpreted the contract specifi *260 cations as expressly stating, in paragraph. 5-02, that the materials necessary for tbe performance of tbis contract in an orderly and efficient manner bad already been made by tbe War Department. In view of all tbe facts and circumstances we doubt that tbey did so interpret the specifications at tbe time tbeir bid was submitted or during the progress of tbe work, but even if they did, such an interpretation was not, in our opinion, a reasonable one.
Certain pertinent provisions of the specifications are set forth in full in finding 5. So far as here material, these specifications provided in paragraph 1-11 (a), entitled “Material, procurement of which is arranged by the Government,” as follows:
The Government will designate the source or sources of and allocate to the contractor the materials listed below in sufficient quantity to construct the Railroad as set forth in the invitation for bids or any addition or additions thereto. The material to be thus allocated in the name of the contractor is:
Paragraph 5-02, upon which plaintiffs especially rely, provided as follows:
GENERAL. — The contractor shall procure from sources designated by the Government, cross-ties, rail material, switches, frogs, tie plates, and spikes for which an allocation has been made.
Paragraph 1-14 of the specifications stated:
Priorities. — Attention of the contractor is called to the fact that a priority rating of A-l-b will be established for this contract. In case the contractor is unable to obtain the required delivery materials and/or equipment which are to become a permanent part of the construction, the contractor shall notify the contracting officer, submitting with his notification supporting data to his claim that the required delivery of such materials or equipment cannot be obtained.
If the completion of the undertaking to be performed under the terms of this contract be delayed by reason of delay in the delivery of materials or supplies essential to such performance because of national-defense priorities and without the fault or negligence of the contractor, the time of performance will be extended for a period equal to such delay, as determined by the contracting *261 officer, and subject to appeal, as provided in Article 9 of the contract.
Paragraph 1-26 of the specifications provided:
Claims, protests, and appeals. — If the contractor considers * * * any action or ruling of the contracting officer * * * to be unfair, the contractor shall, without undue delay, upon such * * * action, or ruling, submit his protests thereto in writing, to the contracting officer stating clearly and in detail the basis of his objections. _ The contracting officer shall thereupon promptly investigate the complaint and furnish the contractor his decision, in writing, thereon. If the contractor is not satisfied with the decision of the contracting officer, he may, within thirty (30) days, appeal in writing to the Secretary of War * * *. Except for such protests or objections as are made of record in the manner herein specified and within the time limit stated, the records, rulings, instructions, or decisions of the contracting officer shall be final and conclusive.
As stated in finding 24, plaintiffs complained verbally to defendant’s Area Engineer about the failure of the contracting officer and the Government to issue the needed purchase allocations, but they made no written protest to the contracting officer, the Chief of Engineers who had charge of issuing purchase allocations, or to the Secretary of War. (United States v. Blair, 321 U. S. 730.)
The facts show that the project covered by plaintiffs’ contract fared better in the receipt of purchase allocations and materials thereon than the average of the projects of a similar nature. In our opinion the delay, due to the shortage of materials and the priorities deemed necessary by the War Department to be given to this and other projects, in the issuance of purchase allocations for materials, cannot be regarded as a breach of the contract. The War Department had in the beginning, as an over-all policy, approved this project as one of many necessary for the prosecution of the war. It was listed as one for which specifications should be prepared and with respect to which materials under control would have to be allocated from time to time, taking into consideration other vital projects requiring similar materials. When all of the circumstances are considered, we think it is obvious that *262 when the specifications were written some time before the contract was made, and at a time when the available supply of materials that would be needed for the project was not sufficient to meet the immediate demands of the war effort, no specific or purchase allocations had been made for deliveries to this project. Under the system in effect at the time, this project had to take its place on the list with other war projects insofar as the issuance of purchase allocation orders to the contractor was concerned. Cf. Gothwaite v. United States, 102 C. Cls. 400; Barbour v. United States, 104 C. Cls. 360; Ross Electric Construction Co. Inc. v. United States, 111 C. Cls. 644.
At the time the contract was entered into sufficient rail for this and other projects was not available and had not been available for over a year. The War Department had a backlog requirement for over twenty-five million linear feet of rail. At that time the Office of the Engineers Corps, which had charge of the purchase of all rail material and the issuance of purchase allocations, had reason to assume that delays would be encountered in supplying rail material for this contract.
As soon as locations were selected for a particular project requiring the use of material such as is here involved, the Office of the Chief of Engineers was notified of the amount of rail to be installed, and immediate action was taken by that office to effect procurement of the necessary rail material, in order to meet, as far as was possible, the required dates of delivery.
A general allocation for the material needed, for the railroad involved herein, had been made in February 1942, in the sense that when the project was approved for construction, the project name, location, and quantity of material needed for it were reported to the senior purchasing officer in the Office of the Chief of Engineers in Washington, D. C., and a list of the materials required was added to those needed for all projects under construction at that time. Specific purchase allocations to contractors were thereafter made from time to time as the work on various projects proceeded, and, of necessity, these had to be issued on the basis of the greatest need.
*263 The specifications, so far as here material, speak of what is to be done in the future. Paragraph 1-11 (a) says that the Government, in arranging for materials for the project, will designate the source and allocate the materials, and paragraph 5-02, which is the foundation of plaintiffs’ claim, has, in our opinion, the same meaning. It is a general provision which advises the contractor, in line with the prior provision in paragraph 1-11 (a), that in the performance of the contract he will be limited in the procurement of his materials to the sources designated by the Government and for which an allocation for such procurement has been made; that is, the contractor must have a specific allocation before he can purchase or procure crossties, rail material, switches, frogs, tie plates and spikes.
For reasons stated we hold that plaintiffs’ interpretation of the phrase “for which an allocation has been made,” appearing in paragraph 5-02 of the specifications, is not supported by the facts and cannot be sustained.
We have decided the case on the merits, but there are other grounds which would preclude plaintiffs from recovering even if defendant had breached the contract by causing unreasonable delay not contemplated thereby. Plaintiffs executed an unconditional release of all claims after the work had been substantially completed, notwithstanding the fact that they were specifically advised at the time that if they desired to reserve the right to make future claims they should reserve such right in the release. Plaintiffs say that this release was not intended to be effective according to its terms because the amount or amounts due under the unit price terms of the contract had not, on December 1, 1942, been finally determined. It is true that the final voucher had not then been prepared but the parties evidently knew what items remained for payment for work performed and remaining to be done. The release related to a claim of the contractor about which there was a controversy and there was none at that time. The release, even though it was not final in all respects as to payment for work actually performed, must be considered as having become final and binding when the final estimate and voucher were prepared and signed by plaintiffs, upon which they received $93,509.81 without protest or reservation of the right to make further claim.
*264 The delay for which damages are claimed related entirely to work performed by plaintiffs’ subcontractor for which, under the terms of the subcontract, plaintiffs were not liable to the subcontractor. See finding 7. The plaintiffs were not damaged and have suffered no loss. See finding 89. In these circumstances the rule announced in Nils P. Severin Company v. United States, 99 C. Cls. 435; James Stewart & Company v. United States, 105 C. Cls. 284, 331; Continental Illinois National Bank and Trust Company of Chicago, Executor, etc. v. United States, 112 C. Cls. 563, is applicable.
Plaintiffs are not entitled to recover and their petition is dismissed. It is so ordered.
Howell, Judge; MaddeN, Judge; Whitakek, Judge; and JoNes, Chief Judge, concur.