**W.G. YATES & SONS CONSTRUC-TION CO., INC., Appellant,**

v.

**Louis CALDERA, Secretary of the Army, Appellee.**

No. 98–1529.

United States Court of Appeals, Federal Circuit.

Sept. 23, 1999.

Karl Dix, Jr., Smith, Currie & Hancock LLP, of Atlanta, Georgia, argued for appellant.

Lawrence N. Minch, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for appellee. With him on the brief were David M. Cohen, Director, Sharon Y. Eubanks, Deputy Director, and Joel McElvain, Attorney.

Before MICHEL, RADER, and GAJARSA, Circuit Judges.

GAJARSA, Circuit Judge.

## DECISION

W.G. Yates & Sons Construction Co., Inc. ("Yates") appeals the final decision of the Armed Services Board of Contract Appeals ("ASBCA"), ASBCA No. 47213, Contract No. DAHA22–92–C–0002. The ASBCA held that (1) Yates remained con-

ditionally liable to its subcontractor, Industrial Door Co. ("IDC"), and therefore Yates had standing to bring a claim of its subcontractor against the Army; (2) the Army did not violate 10 U.S.C. § 2319 regarding qualification requirements for subcontractors; (3) the Army did not violate the conflict of interest provision of 48 C.F.R. § 9.505–2(b); and (4) IDC did not satisfy the requirement of the solicitation regarding the installation of at least ten "similar" doors. We affirm the Board's conclusion that Yates remained liable to IDC but reverse the Board's conclusion that the Army did not violate 10 U.S.C. § 2319. We therefore do not reach the conflict of interest issue or whether IDC met the requirement of similarity in the solicitation. For the reasons set forth below, we affirm-in-part, reverse-in-part, and remand.

## BACKGROUND

On November 19, 1991, the Army issued a solicitation for the construction of support facilities and a composite maintenance hangar to house two tanker aircraft at the Mississippi Air National Guard Base at Key Field, Meridian, Mississippi. Section 08375 of the solicitation, entitled "HANGAR DOORS," required the design, manufacture, and installation of "motor operated steel hangar doors," approximately 306 feet wide and 67 feet high, for a total area of about 20,500 square feet.

This section also contained the two provisions that are at issue before us–paragraphs 1.4.B Qualifications and 1.4.C Standard of Quality:

B. Qualifications: 1.... [T]he manufacturer must support with written evidence that they have designed, manufactured, and installed a minimum of 10 similar door systems *which have been in satisfactory operation for a minimum of five years,* with a minimum of five installations that are equal to or in excess of 60'–0".... 2. Written evidence will include at least 10 hangar door installations made by their company.

Such list shall include name of installation, location, owner, architect, date installed and specific data as to size of doors, type of doors, type of operation.

C. Standard of Quality: 1. Doors and operating mechanisms shall be equal in every respect to those manufactured by the following prequalified manufacturers who are named as the standard of quality desired and acceptable. a. Automated Services Corporation ["ASC"]/Rolling Door, Edmond, Oklahoma; b. Ferguson Door Company; c. Fleming Steel Company—New Castle, Pennsylvania. 2. *Other manufacturers requesting approval as an equal to the companies named must submit their request in writing with the information as detailed in paragraph 1.4B of these specifications. Requests for approval shall be made at least three weeks prior to bid date to permit checking of references and qualifications by the [CO].* Hangar doors will not be approved by the [CO] except by those manufacturers who have so qualified and been approved in writing as having the required experience in the type and size of doors required for this project.

(Emphasis added.)

In a telephone conversation with a representative of IDC on January 13, 1992, less than three weeks prior to the date for opening bids, the contracting officer ("CO") informed IDC that it would waive the pre-bid qualification requirement of paragraph 1.4.C.2 if IDC could meet the remaining requirements at the time of submittal of bids. After the conversation, the CO deleted *only* the requirement of paragraph 1.4.C.2 necessitating a three-week pre-bid qualification for any non-listed manufacturer, thereby permitting qualification after prime contract award but prior to approval of subcontractor.

On January 30, 1992, Yates bid $10,118,-000, which included $500,000 for the hangar doors based on its subcontractor IDC's $490,000 proposal. The Army awarded

Yates the contract. Yates entered into a subcontract with IDC as manufacturer of hangar doors for $455,000. IDC submitted a list of 45 hangar door projects to support its qualification under paragraph 1.4. The Army disapproved of IDC as not meeting the requirements of paragraph 1.4, noting that only four of the hangar door projects submitted (Nos. 5 (two doors), 9, and 16) met the "similarity" requirement. After some confusion as to the meaning of the 60'–0" dimension in the solicitation, the CO waived the requirement of "equal to or in excess of 60'–0" " of paragraph 1.4.B.1. IDC then submitted a new list of hangar door projects in support of its qualification, and the Army disapproved again, noting that only three door projects (Nos. 5 (two doors) and 16) were "similar."[1] The finding of "similarity" was based on comparable area (i.e., at least one-third in size) and motorized operation. The Army further noted that IDC met the technical requirements, including engineering calculations, shop drawings, and other design submittals for the job, but that it failed to meet the manufacturer qualification requirements as established by paragraphs 1.4.B and 1.4.C.

After a series of communications between Yates and the Army in which the parties disagreed as to what "similar" meant, the CO continued to reject IDC, and Yates eventually contracted with and submitted ASC as its subcontractor for the hangar doors. The subcontract between Yates and ASC was for a fixed-price of $614,371, which was $159,371 greater than the proposal from IDC. The Army subsequently approved ASC, which was listed as a "prequalified manufacturer" under paragraph 1.4.C, in one day.

On July 8, 1993, Yates, IDC, and IDC's surety entered into a "Liquidation and Consolidated Claim Agreement" ("LCCA"). The agreement provided, inter alia, that IDC had a claim of $113,000 (presumably for damages and costs due to

the government's improper rejection), that Yates had a $159,371 claim for excess reprocurement costs, and that Yates would sponsor IDC's claims in Yates' name, and if denied by the CO, to appeal IDC's and Yates' claims to the ASBCA. Further, the agreement provided that if the government's rejection of IDC was improper, *"Yates is liable to IDC for its damages and costs* but only as, when, and to the extent Yates receives payment from the Government for IDC's damages and costs." (Emphasis added.) In addition, IDC agreed to reimburse one-half of Yates' $159,371 claim before the Board made its decision and to reimburse the other one-half of the claim within 45 days of the issuance of the Board's decision, whether favorable or unfavorable.

## DISCUSSION

### A. Standard of Review

According to the Contracts Dispute Act, a decision by the ASBCA on questions of law is not final or conclusive. *See* 41 U.S.C. § 609(b) (1994). We review decisions of the ASBCA on questions of law *de novo. See United States v. DeKonty Corp.,* 922 F.2d 826, 827 (Fed.Cir.1991). The ASBCA's interpretations of the contract, 10 U.S.C. § 2319, and the conflict of interest regulations at 48 C.F.R. § 9.505–2(b) are questions of law and, therefore, are subject to *de novo* review. *See Fortec Constructors v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985). A decision by the ASBCA on a question of fact, however, "shall be final and conclusive and shall not be set aside unless the decision is fraudulent or arbitrary, or capricious or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." 41 U.S.C. § 609(b).

### B. Severin Doctrine

As a general rule, subcontractors under government contracts do not have

---

1. No. 9 was determined not to be similar because it was not motorized. Of the three similar doors, their total areas were 12,000, 18,000, and 7,680 square feet.

standing to sue the government. *See Severin v. United States,* 99 Ct.Cl. 435, 442 (1943). This is because such subcontractors lack privity with the government, and the government has not consented to be sued by those with whom it is not in privity. *See id.* However, if the prime contractor is liable to the subcontractor for damages sustained by the subcontractor, that prime contractor can bring an action against the government for the subcontractor's damages. *See id.* at 443. In this circumstance, the prime contractor itself is injured by the acts of the government and, therefore, has standing to sue the government in a pass-through suit on behalf of its subcontractor. *See E.R. Mitchell Const. Co. v. Danzig,* 175 F.3d 1369, 1370 (Fed. Cir.1999). There is privity between the parties because the prime contractor, and not the subcontractor, is suing the government. Finally, if the government seeks dismissal of the prime contractor's pass-through suit, the government bears the burden of proof, and must show that the prime contractor is not responsible for the costs incurred by the subcontractor. *See id.* These rules are commonly known as the Severin doctrine.

■ In its brief to this court, the Army argues for dismissal of Yates' claim under the Severin Doctrine, asserting that Yates bears no real liability to IDC for IDC's damages. In fact, the Army contends that the subcontract made between Yates and IDC on April 1, 1992, "absolved Yates of all liability." We find no language in the subcontract or the LCCA to support this position and, therefore, the Army has not met its required burden.

The original subcontract under section (f) of the Contractor's (Yates') obligations states: "Should the Owner [the Army] fail to pay the Contractor for the work performed by the Subcontractor, then the Contractor shall have no obligation to pay the Subcontractor *unless and until such time as the Owner pays the Contractor.*" (Emphasis added.)

Moreover, the LCCA between Yates and IDC provides:

4. . . . Yates agrees to reimburse IDC for damages or extra costs recovered from the Government but only as contemplated in the Subcontract and as provided for in this Agreement and, as a condition precedent to Yates' liability to IDC, only to the extent Yates receives payment from the Government for IDC's Claim.

10. . . . Yates and IDC stipulate that if the Government's rejection of IDC was improper, to the extent IDC suffered damages and costs as a result, *Yates is liable to IDC for its damages and costs but only as, when, and to the extent Yates receives payment from the Government for IDC's damages and costs.*

(Emphasis added.)

Following the Severin Doctrine, our predecessor court held in *J.L. Simmons Co. v. United States,* 158 Ct.Cl. 393, 304 F.2d 886 (Ct.Cl.1962), that this specific type of conditional liability that Yates and IDC established through the subcontract and the LCCA, in which the prime contractor remains conditionally liable to the subcontractor "only as and when the former receives payment for [damages] from the Government . . . do[es] not preclude suit by the prime contractor in behalf of its subcontractor." *Id.* at 889; *see also Kentucky Bridge & Dam, Inc. v. United States,* 42 Fed. Cl. 501, 527 (1998) (holding that conditional liability on the part of the prime contractor to the subcontractor based on future payment by the government to the prime contractor is "considered sufficient liability to avoid application of the Severin Doctrine"). Given the specific language of the subcontract and the LCCA, Yates clearly remained conditionally liable to IDC.

In its brief, the Army directs the court to a specific paragraph on page three of the LCCA that "expressly reiterated the parties' understanding that Yates bore no liability to IDC." The Army, however, has overlooked the exception clause at the end

of the paragraph. This paragraph states, "WHEREAS, IDC acknowledges and represents that it is the Government and not Yates which is ultimately responsible or liable to IDC for its costs, losses, damages, and expenses, as a result of the Government's rejection of IDC, *except as expressly provided in this agreement.*" (Emphasis added.) As explained above, the LCCA, in paragraphs 4 and 10, specifically holds Yates conditionally liable to IDC.

Therefore, Yates cannot avoid liability if it receives payment from the government for its damages, and Yates is "subject to liability on these claims and will continue to be so until liability is extinguished in accord with the method agreed to" by Yates and IDC in the subcontract and the LCCA. *See Simmons*, 304 F.2d at 890. Because Yates remains liable to its subcontractor, the ASBCA correctly held that Yates has standing to bring a suit against the government on behalf of IDC for IDC's damages and expenses.

### C. Excess Reprocurement Costs

■ Similarly, Yates has standing to bring IDC's claim for excess reprocurement costs that were paid to Yates. According to the LCCA, IDC was required to pay to Yates the excess reprocurement costs of $159,371 in installments, whether the ASBCA ruled favorably or unfavorably for IDC. IDC paid Yates according to its contractual obligations, and Yates sought to recover that sum. The Army argues that, because Yates is not liable to IDC and has already recovered that sum from IDC, Yates cannot recover this sum from the Army.

The language of the agreement does not support the Army's position. In section 12 of the LCCA, Yates expressly agrees to remain liable to IDC for any excess reprocurement costs paid by IDC to Yates if the ASBCA "rules in favor of Yates ... and allows recovery on all or part of the Consolidated Claim." Therefore, Yates remains conditionally liable to IDC and can sue the government on its behalf under the

Severin doctrine. This agreement also mitigates any concern of double recovery by Yates because Yates has already recovered the money from IDC and, therefore, by the terms of the LCCA, Yates must pay to IDC any recovered amount upon award of the ASBCA.

### D. Qualification Requirements

■ The duties incumbent upon an agency that desires to use qualification requirements when soliciting bids for a contract are enumerated in 10 U.S.C. § 2319, entitled "Encouragement of new competitors." The statute defines "qualification requirement" as "a requirement for testing or other quality assurance demonstration that must be completed by an offeror before award of the contract." 10 U.S.C. § 2319(a) (1994). Before establishing a qualification requirement, the agency head must follow the procedures set forth in § 2319(b), including preparation of a written justification stating the necessity of the qualification requirement and promptly furnishing specific information to anyone denied qualification explaining why qualification was denied. When it enacted § 2319, Congress realized that while qualification requirements can ensure product quality by necessitating completion of activities before the award of the contract, they also can inappropriately inhibit competition. *See* H.R. CONF. REP. No. 98–1080, at 319 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4258, 4298. When qualification requirements limit the range of potential bidders to only a few firms, other, equally competent firms are shut out of the bidding process, and the Government loses out on the economies that obtain with more competition. The purpose of the procedural safeguards in § 2319(b) is to ensure that qualification requirements are used only when and to the extent necessary to ensure product quality, reliability, and maintainability, rather than to inappropriately restrict competition. *See id.* Thus, any attempt by an agency to impose qualification requirements without follow-

ing the procedures set out by Congress is a violation of § 2319, and such qualification requirements must be struck down. *See* 10 U.S.C. § 2319(b) (listing the procedures that an agency must follow before establishing a qualification requirement); 48 C.F.R. § 9.206–1(a) (1998) (requiring compliance with the procedures found in 48 C.F.R. § 9.202(a) for qualification requirements to be enforceable); *cf. American Airlines, Inc. v. Austin,* 75 F.3d 1535, 1538 (Fed.Cir.1996) ("[A] provision in a government contract that violates or conflicts with a federal statute is invalid or void."). Therefore, we must first determine whether the Army has established a qualification requirement as defined in § 2319. If so, we must ascertain whether the Army has followed the proper procedures in establishing such a qualification requirement.

In paragraphs 1.4.B and 1.4.C of section 08375 of the solicitation at issue here, the Army established certain requirements for subcontractors desiring to bid on the hangar door project. Paragraph 1.4.B required the bidder to have designed, manufactured, and installed ten similar door systems in satisfactory operation for a minimum of five years. Additionally, paragraph 1.4.C required that, at least three weeks prior to the bid date, a company seeking approval for the bidding had to submit a request for approval, describing the ten door systems necessary for qualification.

■ The ASBCA found that, when the CO informed IDC during a telephone conversation seventeen days prior to contract award that the three week pre-bid qualification requirement would be waived, this effectively removed the remaining requirements of paragraphs 1.4.B and 1.4.C from the statutory definition of "qualification requirement," and thereby rendered moot any possible violations of 10 U.S.C. § 2319 by the CO as alleged by Yates. We disagree with this interpretation of § 2319.

This section of the code establishes that the qualification requirement must be completed "before award of a contract." This

means that the activities or the conditions necessary to satisfy the qualification requirements as established by the CO had to be completed prior to the award of the contract. Specifically, IDC's "quality assurance demonstration"—the existence of ten similar door systems in satisfactory operation for at least five years—still had to satisfy the explicit "before award" requirement as determined by the CO. While the three-week pre-bid qualification requirement of paragraph 1.4.C was waived, this was irrelevant to the pre-award qualification requirement of Paragraph 1.4.B. This required that IDC submit evidence of having manufactured ten door systems which were operating satisfactorily for at least five years prior to the date of the award. This requirement remained in effect.

The Army argues, in support of the ASBCA's holding, that the CO's deletion of the three week requirement rendered the entire qualification provision ineffective as a pre-award scheme, thereby making 10 U.S.C. § 2319 inapplicable. However, when the CO indicated to IDC's representative that it would not enforce the three week pre-bid qualification requirement, that is the only requirement that was eliminated. The qualification requirement found in paragraph 1.4.B remained extant. The fact that the "quality assurance demonstration" was enforced after the award of the contract is of no import, because IDC still must have designed, manufactured, and installed the ten doors at least five years prior to the award date.

■ The Army further contends that solicitations containing qualification requirements to be completed post-award of the prime contract are governed by 10 U.S.C. § 2305(a)(1)(B)(ii) (1994). The clear language of the statute does not support this interpretation:

> In preparing for the procurement of . . . services, the head of an agency shall (i) specify the agency's needs and solicit bids or proposal in a manner designed to

achieve full and open competition for the procurement. . . .

Each solicitation under this chapter shall include *specifications* which . . . (ii) include restrictive provisions or conditions only to the extent necessary to satisfy the needs of the agency or as authorized by law.

10 U.S.C. § 2305(a)(1)(A)(i) & (B)(ii) (emphasis added). This provision addresses specifications, and not qualification requirements. Specifications are the requirements of the particular project for which the bids are sought, such as design requirements, functional requirements, or performance requirements. *See* 10 U.S.C. § 2305(a)(1)(C). The specifications for this project would include the size of the doors, structural steel requirements, ability to withstand wind loads, and the like. Qualification requirements, on the other hand, are activities which establish the experience and abilities of the bidder to assure the government that the bidder has the ability to carry out and complete the contract. They are defined as "requirement[s] for testing or quality assurance demonstration[s] that must be completed before the award of a contract." 10 U.S.C. § 2319(a). The requirement at issue here relates to successful completion of other, similar hangar door projects. This is not a "specification" because it relates to other projects. As discussed above, this is a qualification requirement, and thus is governed by § 2319. Therefore, the Army's contention that § 2305(a)(1)(B)(ii) applies in this case is without merit.

 Because the requirement in paragraph 1.4.B meets the definition of "qualification requirement" as set forth in § 2319, the Army was obligated to follow the provisions as established in that statute, including subsections (b)(1) through (b)(6), that list the actions that the head of an agency must take when establishing a qualification requirement. The record establishes that the Army did not follow the statutory and regulatory requirements, thereby rendering the qualification requirement invalid and unenforceable. See 10 U.S.C. § 2319(b) (1994); 48 C.F.R. § 9.206-1(a) (1998). Therefore, IDC was not obligated to meet the qualification requirement regarding the design, manufacture, and installation of at least ten similar door systems for five years prior to award date, making the Army's disqualification of IDC contrary to its statutory and regulatory mandates. Under the LCCA, because IDC was wrongfully disqualified, Yates is liable to IDC for IDC's damages and costs. Therefore the government is liable to Yates for these damages and costs. Furthermore, the government is also liable to Yates for the excess reprocurement costs, and under the LCCA, this amount must be paid over to IDC when it is received.

## CONCLUSION

For these reasons, we affirm the Board's conclusions that Yates remained liable to IDC but reverse the Board's conclusion that the Army did not violate 10 U.S.C. § 2319. Because we find that the Army did violate § 2319, thereby rendering the purported qualification requirement invalid, we do not need to reach the issues of the alleged conflict of interest violation in the promulgation of the requirement or whether IDC satisfied the "similarity" requirement.

Thus, we *AFFIRM–IN–PART, REVERSE–IN–PART,* and *REMAND.*

## COSTS

Each party shall bear its own costs.