**PERRY–McCALL CONSTRUCTION, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 97–414C.**

United States Court of Federal Claims.

May 8, 2000.

William E. Dorris, Atlanta, GA, for plaintiff.

Opher Shweiki, U.S. Department of Justice, Washington, D.C., with whom were David W. Ogden, Acting Assistant Attorney General, Director David M. Cohen, and Assistant Director Kathryn A. Bleecker.

## OPINION

FIRESTONE, Judge.

This matter is before the court on the parties' cross motions for summary judgment. Plaintiff, Perry–McCall Construction, Inc. ("Perry–McCall"), brings this suit on behalf of its subcontractor, Qualico Steel Co. ("Qualico"), to recover from the government excess costs Qualico incurred in obtaining certain materials in connection with Perry–McCall's contract with the Department of the Navy for construction of an airplane hangar and parking apron.

▆ The threshold issue before the court is whether this case is barred by the *Severin* doctrine because, following initiation of this action, Qualico executed a general release that, on its face, exonerates Perry–McCall from any and all liability to Qualico in connection with the Navy contract. Under the *Severin* doctrine, a prime contractor may not sue the government for contract damages incurred by a subcontractor unless the prime contractor remains potentially liable to the subcontractor for those same damages. *See Severin v. United States*, 99 Ct.Cl. 435, 443, 1943 WL 4198 (1943). Alternatively, if the court finds that *Severin* does not bar this action, the court must decide the merits of the parties' cross motions for summary judgment. For the reasons that follow, the court concludes that there are material facts in dispute with regard to both issues that preclude the court from granting summary judgment.

## FACTUAL BACKGROUND

### A. Facts Giving Rise to this Action

The following facts are not in dispute, except as noted. On September 23, 1994, Perry–McCall and the Department of the Navy entered into a $23,543,000 fixed-price contract for the construction of the P–3 Hangar and Parking Apron at the Naval Air Station in Jacksonville, Florida. In August 1994, Perry–McCall entered into a $5,302,000 subcontract with Qualico to provide the steel needed for the project. The contract identified certain design specifications for the steel tubing necessary to construct the hangar. In particular, the contract called for 20″ × 20″ × 5/8″ square steel tube sections that satisfied ASTM A 500, Grade C standards.

According to Qualico's president, John Downs, Qualico did not confirm the availability of the tubing before it submitted its subcontract bid. In his deposition, Mr. Downs testified that Qualico believed, based on the specification, that the required steel tubing would be commercially available. "[We took] the documents at their word that [the specified steel tubes] are available in a structural steel member manufactured by a tube mill." Downs Depo. at 27 (June 23, 1999). Some time after submitting its bid, Mr. Downs located a manufacturer of steel tubing, Valmont Industries, Inc., but discovered that "[w]hile Valmont did manufacture 20″ × 20″ × 5/8″ tubing, its 20″ × 20″ × 5/8″ tubes were not of ASTM A 500, Grade C quality." Downs Aff. ¶ 8 (Oct. 8, 1999). ASTM A 500, Grade C standards require a minimum tensile strength of 62,000 pounds per square

inch ("psi") and a minimum yield strength of 50,000 psi. The Valmont steel tubing was identified as having a minimum of 58,000 psi tensile strength and 46,000 psi yield strength. *See* Facsimile from Valmont to Tim Griswold, Qualico Steel Co. (Sept. 1, 1994). Qualico contends that it looked elsewhere for tubing that conformed to the contract standards, but found that it was not available from any steel tubing manufacturer.

Upon concluding that no commercial manufacturer, including Valmont, fabricated the specified steel tubing, Qualico hired Ferrell Engineering, Inc. to assist it in developing alternatives that would satisfy the requirements of the contract. By letter dated October 23, 1994, "Ferrell informed the [Navy's] architect, O'Kon & Company ("O'Kon"), that the requisite 20″ × 20″ × 5/8″ steel tubing was not commercially available and accordingly requested a substitution" of wide flange steel members. Downs Aff. ¶ 10 (Oct. 8, 1999). O'Kon rejected the substitution and directed Qualico back to Valmont to obtain the steel tubing specified under the contract.

Shortly thereafter, Qualico wrote to O'Kon explaining that the specified tubing was not readily available from Valmont, but was a "custom-built, fabricated item." Downs Depo. at 31. In addition, Qualico expressed concerns about the safety of any custom fabricated tubing, which would require welding several smaller sections of tube together to span the entire length of the hangar. As a consequence, Qualico was reluctant to use any of Valmont's tubing for the project. According to Mr. Downs, the concern related to "how many splices that would be in a tension member that's going to hold up trusses over millions of dollars of planes." *Id.* In addition, Mr. Downs was also concerned that Valmont's regular tubing product was not immediately available, but had a "sixteen week delivery time." *Id.* at 29.

In an effort to resolve the steel issue, Qualico submitted a request for a "contract change" to Perry–McCall on November 3, 1994. *See* Letter from John Downs, Qualico Steel Co., to Wayne McCall, Perry–McCall Constr. (Nov. 3, 1994). Perry–McCall took Qualico's request and filed a "variance request" with the Navy on November 17, 1994,

under the heading "Variance Request # 4." Variance # 4 requested substituting a configuration of two steel channels with cover plates in lieu of the required steel tubing. By letter dated December 14, 1994, Robert Weilacher, a structural engineer at O'Kon, informed Qualico and Perry–McCall that O'Kon would recommend that the substitution "should be pursued with a credit to the owner (U.S.Navy)." Letter from Robert Weilacher, O'Kon & Co., to Richard Bush, Qualico Steel Co. (Dec. 14, 1994). On December 16, 1994, Qualico proceeded with the substitution without waiting for final Navy approval.

On February 16, 1995, O'Kon sent a letter to the Navy recommending Variance # 4, stating that "the construction schedule should be unaffected by this change. The construction contract should decrease." Letter from O'Kon & Co. to Dept. of the Navy, Attn: Larry Blackburn (Feb. 16, 1995). Navy Assistant Resident Engineer Philip R. Robbins approved the substitution and notified Perry–McCall by letter dated February 7, 1995. The letter states as follows: "Your Variance # 4 proposing to fabricate the specified structural tube shape from two channels and connecting splice plates is hereby approved. Since the specified cross section is apparently not available a modification to the Contract is not sought regarding this specification change." Letter from Philip R. Robbins, Assistant Resident Engineer, Dept. of the Navy, to Perry–McCall Constr. (Feb. 7, 1995).

Although the contract does not address "variances," it does have a provision entitled "Variations." Under the Variations clause, variations from contract specifications are permitted if they are advantageous to the Government, but they must be completed at the cost of the contractor. Clause 1.3.4 of the contract, "Variations," provides in relevant part:

When submitting a variation for approval, the Contractor warrants the following: ...

1.2.3.4 Contractor is Responsible

The contractor shall take actions and bear the additional costs, including review costs by the Government, necessary due to the proposed variation.

Although a contract modification was not sought, Qualico, in fact, experienced increased costs as a result of the substitution. On May 15, 1995, Qualico sent a letter to Perry–McCall requesting reimbursement of $408,018 for the extra costs incurred as a result of the substitution under the variance. Letter from Richard Bush, Qualico Steel Co., to Perry–McCall Constr. Co., Attn: Dick Gilreath (May 15, 1995). This figure represents a 200 percent increase over Qualico's original bid price of $191,637 for the steel tubing, due primarily to the additional labor required to fabricate the substitute product. On June 12, 1995, Perry–McCall submitted a Request for an Equitable Adjustment ("REA") for $459,693 to the contracting officer ("CO"), which included Qualico's costs plus 8 percent overhead, 6 percent profit, and 1.5 percent bond cost charges for Perry–McCall. Prior to this REA, Perry–McCall had not notified the Navy of any additional charges associated with Variance # 4.

The CO denied Perry–McCall's REA on August 9, 1995, stating:

> Specified section is available from source cited in the American Institute of Hollow Structural Sections. Valmont Industries validated this source information. This source was identified to the subcontractor before they decided to fabricate an alternate section.

Thereafter, on September 13, 1995, Perry–McCall, requested a final decision from the CO. On June 13, 1996, the CO denied plaintiff's claim on the grounds that:

> The government approved the substitution under the impression that there would be a credit to the contract. Since costs were not mentioned until six months after the approval, the Government was prejudiced by the lack of timely notice of costs to be incurred. Since the material requested in the specifications was readily available at a lower cost, if it had been made known at the time of the substitution request that additional costs were involved, the Government would have had the opportunity to make an informed cost/benefit analysis before the decision was made. Since the Government was not allowed that opportunity, I can only conclude that you acted as

a volunteer and incurred costs for which the Government is not responsible.

Perry–McCall filed the present action for $459,693.48 on June 12, 1997. On September 10, 1999, the government moved for summary judgment. Perry–McCall submitted its cross motion on September 16, 1999. The court heard oral argument on the parties' cross motions on April 13, 2000.

## B. The Parties Contentions

### 1. *Severin*

In its motion for summary judgment, the government contends that Perry–McCall's action before this court is barred under the *Severin* doctrine because Perry–McCall is no longer liable for Qualico's excess costs. Alternatively, the government argues that it is entitled to summary judgment on the merits. In support of its motion the government has presented the following additional evidence to the court.

The government bases its *Severin* argument on a March 22, 1999, "Final Waiver and Release" executed between Perry–McCall and Qualico. The "Final Waiver and Release" provides in relevant part as follows:

> the undersigned does hereby waive, release, and relinquish any and all rights, claims, demands, liens, claims for relief, causes of action and the like, whether arising at law, under a contract, in tort, in equity or otherwise, which the undersigned has now, may have had or may have in the future, arising out of the performance of work or the furnishing of labor or materials by the undersigned pursuant to a subcontract or purchase order with Perry–McCall Construction, Inc. in connection with construction of: P–3 MAINTENANCE HANGAR AT THE NAVAL AIR STATION, JACKSONVILLE, FLORIDA.

According to the government, because the *Severin* doctrine bars a prime contractor from maintaining a pass-through action on behalf of a subcontractor to whom it is not liable, this "Final Waiver and Release" bars Perry–McCall from continuing with this action.

In further support of its motion, the government relies on the deposition testimony of

John Downs, President of Qualico, who testified that, "[i]f we don't collect on the claim, I mean, we just won't collect on it. We're not going after Perry–McCall.... No, sir, I will not, period, mess with Mr. McCall. This has nothing to do with him.... I never intend to do anything to Perry–McCall." Downs Depo. at 132–33. The government argues that this statement supports construction of the release as a complete release of all claims against Perry–McCall, including the steel tubing claim.

In response to the government's *Severin* argument, Perry–McCall argues that the asserted release was not intended to apply to the pending claim. Perry–McCall submits the affidavits of Dick Gilreath, Perry–McCall's project manager on the contract, and Mr. Downs, who provide in almost identical statements the following:

> Qualico executed several separate waiver and release documents for the benefit of Perry–McCall subsequent to Qualico's substantial completion of its Project work. These releases were executed in conjunction with Qualico's receipt of payment from Perry–McCall for Change Orders that Perry–McCall had sought on behalf of Qualico for additional costs associated with design errors and/or extra work directed by the Government. *Both Perry–McCall and Qualico expressly agreed that each respective waiver and release apply to only a discrete, individual design problem and/or change order.* Subsequent to the execution of each respective release, Perry–McCall has continued to pursue compensation on Qualico's behalf for additional costs associated with other design errors. In an express, verbal agreement, made before the execution of the releases and confirmed after them, Perry–McCall agreed to pay Qualico all invoices Perry–McCall recovered from the Government on Qualico's behalf regarding the steel tube claim, and Perry–McCall has never wavered from this agreement nor does it intend to do so.

Gilreath Aff. ¶ 8; Downs Aff. ¶ 16 (emphasis added).

As further evidence that the March 22, 1999 release was one of several releases, each of which was intended to apply "to only a discrete, individual design problem and/or change order," and *not* to the claims pending in this suit, Perry–McCall and Qualico submitted another release document, executed on January 28, 1999, for payments of $79,484. Perry–McCall also notes that the March 22, 1999 release was for only $54,347. The fact that there were multiple releases, Perry–McCall argues, demonstrates that they did not intend any of the releases to be a complete release of Qualico's claims.

### 2. Steel Tubing Claim

With respect to the merits of the steel tubing claim presented on Qualico's behalf in this case, the government argues that it is entitled to summary judgment because: (1) Perry–McCall bore the risk of obtaining the product called for in the design specification; and (2) even if the design specification was defective because the steel members were not commercially available, Perry–McCall prejudiced the government's ability to determine the least costly alternative to the specified steel tubing by failing to timely notify the government of the significant cost increase.

In addition, the government asserts that Perry–McCall did not need to incur the expense of the substitution because the Navy would have accepted a lesser-grade steel tube, which would have been less costly than the Qualico substitute. As explained by James O'Kon, the architect hired by the Navy for the project, the design specifications for the project could have been relaxed to allow for the Valmont product of lesser-grade steel:

> if Qualico came back and said we can't get the [Grade] C, but we can get the B, which has got a yield strength of 46,000, we would have looked at our optimum situations. This is compression and not tension and it's only like 12,000 pounds per square inch total pressure. Because there were small members and the allowables were reduced, so you didn't need the big number, you just needed the smaller number. We would have accepted it.

O'Kon Depo. at 63 (June 24, 1999). James Caulder, the Navy's in-house engineer responsible for design contract management,

agreed that the design specifications could have been relaxed, stating in his deposition, "I think the grade B and the 20 by 20 by 5/8ths would have worked." Caulder Depo. at 53 (June 24, 1999).

Perry–McCall contends in response that it is entitled to summary judgment because the specified tubing was not commercially available, and therefore, the specification was defective. According to Perry–McCall, standard custom and usage in the steel construction industry provides that where a specific steel member is identified, it is presumed that the project designer confirmed its commercial availability. As explained in his affidavit, Mr. Downs relied on this standard practice in preparing Qualico's bid:

At the time Qualico bid the Contract, it interpreted the Plans and Specifications as indicating that 20″ × 20″ × 5/8″ structural steel tubing in compliance with ASTM A 500, Grade C was available for use on the Project. Qualico relied on the standard custom and practice of the structural steel industry, which holds that a designer determines the commercial availability of major structural steel members that it includes in its design and, if these members are not commercially available, then it is incumbent on the designer to provide the requisite information to specifically fabricate the members. Since this information was lacking from the Plans and Specifications, Qualico assumed that the [specified] tubes were commercially available, and relied on this bidding assumption in preparing and submitting its bid.

Downs Aff. ¶ 7 (Dec. 20, 1999); see also Ferrell Aff. ¶ 11 (Nov. 17, 1999) ("In accordance with established and recognized steel industry custom and practice placing the burden on the designer to determine the availability of specified members ... bidders of structural steel design documents understand and assume that if the plans and specifications lack information necessary to specially fabricate a structural member, then the designer must have determined that the member is available in the existing market.").

Upon learning that steel tubing meeting the design specification was not commercially available, but would have to be custom made,

Qualico proposed substituting the welded channel/plate member in lieu of the specified steel tubing. According to Qualico, based on its investigation and consultation with Ferrell regarding the issue, the proposed substitution was the least costly alternative to the specified tubing:

it is Qualico's informed belief, both currently and at the time that it implemented the channel/plate alternative, that the substitution of the channel/plate members was the least costly alternative, that satisfied the Project's strength requirements, to the problem presented by Valmont Tubing's noncompliance with ASTM A 500, Grade C.

Downs Aff. ¶ 12 (October 8, 1999). Mr. Downs further explained in his deposition that Qualico did not want to use the product Valmont offered because it presented safety concerns:

Where we got concerned was, how may splices that would be in a tension member that's going to hold up trusses over millions of dollars of planes. So it is not a normal practice for a structural member under the tension that these members were under to have splices, period, in it, let alone eight splices a piece. So the more I got to looking at what [Valmont was] offering, the more I realized the liability was too great, we had to look at this further.

Downs Depo. at 31.

Perry–McCall concedes that it did not notify the government of the increased costs associated with Qualico's alternative at the time it submitted Variance Request # 4. However, Perry–McCall asserts that the government was not prejudiced by any delay in giving the government notice of the increased costs because Qualico's substituted steel product was the least costly alternative.

## DISCUSSION

### A. Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. See Rules of the Court of Federal Claims ("RCFC") 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "When the parties have filed cross motions for summary judgment, . . . the court must evaluate each motion on its own merits." *Thermocor, Inc. v. United States,* 35 Fed.Cl. 480, 485 (1996). "The fact that both parties argue in favor of summary judgment and allege that there are no genuine issues of material fact for trial does not relieve the court of its duty to decide whether summary judgment is appropriate." *Id.* (citing *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988)). In deciding whether summary judgment is appropriate, it is not the court's function "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. 2505.

## B. The *Severin* Doctrine

■ In its motion for summary judgment, the government contends that Perry–McCall's suit is now barred by the *Severin* doctrine based on a "Full and Final Waiver and Release," executed between Perry–McCall and Qualico on March 22, 1999, purporting to relieve Perry–McCall from liability for "any and all rights, claims" arising from the Navy contract. The *Severin* doctrine precludes a prime contractor from bringing a pass-through suit for a subcontractor where the prime contractor is not liable to the subcontractor. *See W.G. Yates & Sons Constr. Co. v. Caldera,* 192 F.3d 987, 991 (Fed.Cir.1999). Under the *Severin* doctrine, the government bears the burden of establishing that the prime contractor has been completely exonerated against claims brought by the subcontractor. *See id.; J.L. Simmons Co. v. United States,* 304 F.2d 886, 888, 158 Ct.Cl. 393, 397–98 (1962).

Perry–McCall argues that the March 22, 1999 release does not bar this action because Perry–McCall and Qualico executed several releases and that each release was intended to apply "to only a discrete, individual design problem and/or change order," for which the amount specified in the document was paid to Qualico. Further, Perry–McCall states that subsequent to each of the releases, it continued to seek compensation on behalf of Qualico for additional costs associated with other design errors, including the steel tubing claim. In these circumstances, Perry–McCall argues that it remains liable to Qualico for the steel tubing claim, and therefore, the *Severin* doctrine does not apply.[1]

■ A release is a contractual provision, and its interpretation is a matter of law. *See Kenbridge Constr. Co. v. United States,* 28 Fed.Cl. 762, 765 (1993) (citing *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 916 (Fed.Cir.1984)). In resolving a dispute of interpretation, the primary purpose of the court is to ascertain the intent of the parties. *See Alvin, Ltd. v. United States Postal Serv.,* 816 F.2d 1562, 1565 (Fed.Cir. 1987) (citations omitted). As a general rule, the court may not look to extrinsic evidence to determine the meaning of a clear and unambiguous release. *See McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996). Where the terms of a release are ambiguous, however, the court may resort to extrinsic evidence to determine the intent of the parties. *See id.* (citing *Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 458 F.2d 994, 1005 (1972)).

In this connection, courts have recognized that where parties execute multiple releases, an ambiguity exits, and thus, extrinsic evidence should be considered to discern the parties' intent. *See Sorrels Steel Co. v. Great Southwest Corp.,* 906 F.2d 158, 166–67 (5th Cir.1990). In *Sorrels Steel Co.,* a case similar to the case at bar, the Fifth Circuit determined that the execution of several complete releases created an ambiguity that warranted consideration of parole evidence. *Id.* at 167. As the Fifth Circuit stated, "[i]f these releases were intended to discharge

---

1. Relying on *Seger v. United States,* 199 Ct.Cl. 766, 469 F.2d 292, 300 (1972), Perry–McCall also alleges that the *Severin* doctrine is not applicable because its claim is brought as a request for an equitable adjustment. Plaintiff's argument is misplaced. The court in *Seger* specifically stated in a footnote that the decision in that case did not address a situation, such as in the present case, where a release "explicitly and unequivocally provided that the prime contractor was not in any way liable to the subcontractor for [damages] to the subcontractor which were compensable through an equitable adjustment under the contract." *Id.* at n. 30.

[the prime contractor] from all liability for [the subcontractor's] impact and testing claims, as [the prime] asserts, there would have been no need for [the subcontractor] to execute four of them." *Id.*

■ Here, the court also finds that the execution of multiple "Full and Final" releases creates an ambiguity that warrants the consideration of extrinsic evidence to discern the parties' true intent. Although the releases each state that they are full and final releases, there would have been no need for Qualico to execute several releases if this were true. Moreover, each release identifies a specific amount of money as consideration, and none of the amounts identified correlate with the amount at issue here. The ambiguity is further magnified by the fact that the parties executed the release relied upon by the government nearly two years after the initiation of this lawsuit, but without any mention of the pending claim.

Because the court concludes as a matter of law that the release relied upon by the government is ambiguous, the court may look to parole evidence to determine the parties' intent. *See Sylvania Elec.,* 458 F.2d at 1005.[2] Here, as set forth above, Perry–McCall and Qualico have submitted affidavits stating that the March 22, 1999 release was not intended to apply to the pending claim. In addition, in response to questioning by the court, counsel for plaintiff stated at oral argument that Perry–McCall remains liable to Qualico for the pending claim.

■ The government refutes this argument with the testimony of Qualico's president, who stated that he is only looking to the government for payment and does not intend to sue Perry–McCall for the additional costs Qualico incurred. *See supra* p. 668. Although Qualico's statements are relevant, they are not dispositive. It is the prime contractor's liability that must be established, regardless of whether the subcontrac-

tor intends to avail itself of its rights against the prime. *See Cross Constr. Co. v. United States,* 225 Ct.Cl. 616, 618, 1980 WL 13189 (1980) ("The mere fact that Cross dismissed its suit against [the prime] ... does not necessarily mean that *Simmons* is inapplicable and that Cross has no right to demand any money that [the prime] may recover from the Government in the present suit."). The case law makes clear that where the prime contractor openly renounces liability, the *Severin* doctrine cannot be overcome by the prime's mere agreement to share with the subcontractor any money recovered from the United States. *See Pearson, Dickerson, Inc. v. United States,* 115 Ct.Cl. 236, 243, 264, 1950 WL 5011 (1950). *Severin* mandates that the prime contractor remain at least conditionally liable to the subcontractor, even if only to the extent of its recovery from the United States. *See J.L. Simmons Co.,* 304 F.2d at 888–89. The government contends that Mr. Downs' statements that Qualico will not sue Perry–McCall prove that the releases are complete and that the prime contractor is no longer liable to the subcontractor. The government further argues that assertions by counsel to the contrary are insufficient to establish Perry–McCall's liability.

■ The court finds that issues of fact preclude summary judgment on this question. Although the court concludes that the release is ambiguous, there is insufficient evidence before the court to make a determination regarding the parties' true intent in executing the March 22, 1999 release. The affidavits submitted by plaintiffs, when viewed together with the deposition testimony, create triable questions of fact that preclude a grant of summary judgment on the issue of whether this case is barred by the *Severin* doctrine.

---

**2.** In view of the foregoing, the government's reliance on *George Hyman Constr. Co. v. United States,* 30 Fed.Cl. 170 (1993), *aff'd,* 39 F.3d 1197 (Fed.Cir.1994) (table), is misplaced. In that action, the court determined that once a complete release had been executed the parties could not "revive" a claim by seeking to reform the agreement in this court. *Id.* at 177. Perry–McCall

does not ask the court to reform the terms of the release. Rather, Perry–McCall asks the court to construe the terms of the release to effectuate the parties' intent, as evidenced by their sworn statements, that the release was not intended to apply to the pending claim. Accordingly, the holding in *George Hyman Constr. Co.* does not apply.

## C. The Merits

The government contends that even if the *Severin* doctrine does not bar this case, summary judgment for the government is still appropriate. According to the government, Perry–McCall is not entitled to an equitable adjustment as a matter of law because the design specifications were not defective, and even if they were defective, the government was prejudiced by Perry–McCall's failure to provide the government with timely notice of the increased costs associated with Variance # 4.

### 1. Whether the design specifications were defective

■ Perry–McCall maintains that custom and usage in the steel industry provides that where, as here, a contract specifies a major structural steel member without supplying all information necessary to fabricate the members, it is understood that the designer has confirmed the availability of such member. Perry–McCall further maintains, and the government does not disagree, that the steel tubing specified in the contract was not commercially available. Perry–McCall argues that in such circumstances, the specification was defective and therefore, it is entitled to an equitable adjustment for any increased costs associated with remedying the defect.

The government argues that whether the steel tubing was commercially available is not relevant because there is generally no implied warranty of commercial availability, and the contract did not expressly include any such warranty. Accordingly, the government argues that Perry–McCall bore the risk that the steel tubing would be commercially unavailable.

In view of these conflicting contentions, the court concludes a trial is needed to determine whether custom and usage in the steel industry renders the specification ambiguous, and, if so, whether it shifts the risk of commercial unavailability to the government. *See Western States Constr. Co. v. United States*, 26 Cl.Ct. 818, 825–26 (1992).

### 2. Whether the government was prejudiced by Perry–McCall's late notice

■ The government further argues that, even if the specifications were defective, Perry–McCall is not entitled to an equitable adjustment because Perry–McCall failed to give the government timely notice of the increased cost of Qualico's proposed substitution. With respect to the notice requirements under the changes clause, it is generally recognized that a contractor is not entitled to an equitable adjustment where the government is prejudiced by the failure to timely notify the government of a constructive change. *See Calfon Constr. Inc. v. United States*, 18 Cl.Ct. 426, 438 (1989) ("Written notice as to constructive changes must be supplied by the contractor before such time that the Government would suffer if not apprised of the facts.").

■ The government argues that it was prejudiced in this case because Perry–McCall agreed to perform the substitution as a no-cost variance under the terms of the contract, and thus, there was no opportunity to determine if the proposed solution was the least costly alternative. The government asserts, based on the deposition testimony of the Navy's project engineers, that had it known of the increased cost of the proposed substitution, the Navy would have relaxed the specifications to allow Perry–McCall to use the steel tubing that was commercially available from Valmont. *See supra* p. 669. The government contends that this would have been the least costly alternative, and hence, it was prejudiced by Perry–McCall's failure to provide notice. Indeed, the government argues that the court may not question the Navy's contention that it would have relaxed the design specification to allow for the Valmont grade B product. *See Calfon Constr., Inc.*, 18 Cl.Ct. at 435 (finding that the government is well within its contractual rights to decide to accept product of relaxed design specification).

Perry–McCall asserts in response that Mr. Downs' statements prove that Qualico's substitute steel product was the least costly alternative because, contrary to the Navy's contentions, the specifications could not have been relaxed without compromising the safe-

ty of the hangar. *See supra* p. 670. Perry–McCall further contends that the court should grant summary judgment in its favor because the government has not presented any evidence from the CO to show that the Navy would have, in fact, accepted a steel product based on a relaxed specification.

In light of the parties' conflicting evidence, a triable issue of fact exists regarding whether the government would have accepted the lesser-grade steel tubing.

## CONCLUSION

Based on the foregoing, the court concludes that genuine issues of material fact preclude a grant of summary judgment to either party in this case. Accordingly, the parties' cross motions for summary judgment are **DENIED**. The court will contact the parties within 20 days to schedule further proceedings consistent with this opinion.